138 P.2d 503

In re SANTILLANES.

No. 4760.

Supreme Court of New Mexico.

April 13, 1943.

Rehearing Denied May 14, 1943.

William T. O'Sullivan, of Albuquerque, for petitioner.

Edward P. Chase, Atty. Gen., Harry L. Bigbee, Asst. Atty. Gen., and Robert W. Reidy, Asst. Dist. Atty. of Bernalillo County, of Albuquerque, for respondent.

PER CURIAM.

Upon consideration of the motion for rehearing, the previous opinion is withdrawn and the following substituted:

MABRY, Justice.

This is an original habeas corpus proceeding brought under the provisions of Article VI, Sec. 3, New Mexico Constitution, and Rule 24, Supreme Court Rules. The writ was first applied for and hearing had upon the several questions here presented before the Honorable A. W. Marshall, District Judge of the Sixth Judicial District. Petitioner was there denied the relief sought and the act was held constitutional. Petitioner then filed this original proceeding here. This he may do. Ex parte Nabors, 33 N.M. 324, 267 P. 58. And here, as in the Nabors case, we are not called upon to say, and do not decide, to what extent, if any, the decision of the district court first hearing the matter might influence us.

The writ was issued upon the petition of a minor, one Jose Santillanes, acting by and through his father and natural guardian, Moses Santillanes. The said minor had theretofore been found to be and adjudged a juvenile delinquent within the meaning of the statutes of New Mexico relative to such juveniles (1941 Comp., Art. I, Ch. 44), and sentenced to confinement to the Bernalillo County Detention Home for a period of thirty days.

All questions raised by petitioner which are important will be considered, although not in the exact order or under the particular grouping as presented.

Petitioner first challenges the constitutionality of the act creating the Juvenile Court (Chap. 44, 1941 Comp.), which act was an amendment of the earlier statute, Chapter 4, Laws 1917. He says that having held a part of the present act unconstitutional—that part dealing with those who contribute to the delinquency of minors as it purports to afford an appeal—that the whole act must fall since the offending portion is not severable. Petitioner relies upon the disposition we made of the issue in State v. Eychaner, 41 N.M. 677, 73 P.2d 805. We did not hold any portion of the act unconstitutional in the Eychaner case, though we did suggest the unconstitutionality of the portion there dealt with if provision for an appeal from the Juvenile to

the Supreme Court were attempted to be made, a question which we did not decide, because not necessary.

■ Moreover, petitioner is not in a position to attack that portion of the act dealing with those charged with contributing, because he has no such problem here. Respondent senses this difficulty confronting petitioner, the difficulty of raising the question of the constitutionality of a portion of the act with which he is not here concerned; but respondent says that, nevertheless, if an examination into the question as it pertains to such portion of the act is had, and it should be held unconstitutional as to that part, petitioner would still be without relief. Section 44-112 of the act dealing with those who contribute to delinquency must be considered severable, in any event the Attorney General argues, citing State v. Brooken, 19 N.M. 404, 143 P. 479, L.R.A.1915B, 213, Ann.Cas.1916D, 136; Schwartz v. Town of Gallup, 22 N.M. 521, 165 P. 345; State v. Walker, 34 N.M. 405, 281 P. 481; City of Roswell v. Holmes, 44 N.M. 1, 5, 96 P.2d 701. See State v. Ritchie, 97 Ohio St. 41, 119 N.E. 124; and also Mill v. Brown, 31 Utah 473, 88 P. 609, 613, 120 Am.St.Rep. 935, which hold separable the section dealing with those who contribute, thus saving the portion dealing solely with juvenile delinquents. Speaking of Section 7 of the Utah act having to do with adults contributing to juvenile delinquency, that court observes in support of its severability that: "Section 7 of the act, for the reason that it violates this elementary provision, so to speak, of criminal law and procedure, must, therefore, be held of no force or effect. This, however, in no way affects the other provisions or sections of the act. Section 7 was a mere excrescence, in one sense, on the principal provisions of the act, in no way connected with it so far as it affects the right to deal with children, * * *."

The rule to be applied in determining the separability of the constitutionally objectionable portion of an act from the unobjectionable has been well stated by our court in Schwartz v. Town of Gallup, supra. Since those portions of the statute dealing with those who contribute to delinquency are entirely separable from the part which deals with delinquents themselves, respondent argues, to hold unconstitutional such portion could not affect the remainder of the act. We agree with this contention. We are not prepared to say that the lawmakers "would not have passed the portion retained" in the act if they should have "known that the void provisions must fall". Schwartz v. Town of Gallup, supra [22 N.M. 521, 165 P. 348]. However, we need not, and we do not, decide the question. We merely point to the serious query thus presented. See 31 Am.Jur. 809, § 47, and cases cited under note 15, holding such legislation unconstitutional.

Petitioner challenges the constitutionality of the act for the reason that an attempt is thereby made to deprive the district courts of that original jurisdiction which he thinks was given exclusively to them under the Constitution. He relies upon

the following constitutional provision found in Article VI, Section 13, which reads: "The district court shall have original jurisdiction in all matters and causes not excepted in this constitution, and such jurisdiction of special cases and proceedings as may be conferred by law, * * *."

But, Article VI, Section 1, of the Constitution provides: "The judicial power of the state shall be vested in the senate when sitting as a court of impeachment, a supreme court, district courts, probate courts, justices of the peace, and such courts inferior to the district courts as may be established by law from time to time in any county or municipality of the state, including juvenile courts."

Petitioner urges that control of minors, which, unless otherwise provided, would repose in the district courts as an inherent power, is not a matter "excepted in this constitution". No one disputes his contention that under any proceeding the district court, sitting as a court of equity, has broad inherent power concerning the custody and control of minors.

Petitioner's attack upon the constitutionality of the statute, numbered 4, is as follows: "4. In conferring upon said Juvenile Court exclusive original jurisdiction over juvenile delinquents and over those who contribute to such delinquency and over all matters arising under said Act, the resulting diminution in the jurisdiction of district courts is violative of the provisions of Article VI, Section 13, of the Constitution of the State of New Mexico."

If Chapter 4, Laws 1917, which is entitled "An Act defining juvenile delinquents," etc. as amended by Chapter 87, Laws of 1921, undertakes to abrogate the jurisdiction of district courts reposed by that portion of Section 13 of Article VI of the Constitution, as follows: "The district court shall have original jurisdiction in all matters and causes not excepted in this constitution" a serious question might be presented.

We indulge the well-known presumptions that the legislature is presumed to have performed its duty and kept within the bounds fixed by the Constitution, and therefore the judiciary will, if possible, give effect to the legislative intent unless it clearly appears to be in conflict with the Constitution. Asplund v. Alarid, 29 N.M. 129, 219 P. 786; State v. Eldodt, 33 N.M. 347, 267 P. 55; State v. Sargent, 24 N.M. 333, 171 P. 790.

From the earliest times, children have been regarded as the wards of chancery. The Crown was parens patriae and exercised its prerogatives to aid unfortunate minors through the Great Seal. Generally the Chancellor acted only when a property right was involved, but this element went only to the exercise of jurisdiction, and not to the jurisdiction itself. For a comprehensive discussion of this branch of equity jurisdiction, see Pomeroy, Equity Jurisprudence, 5th Ed., Chapter X, Section 1303 et seq.

We assume that the legislature by the enactments herein involved did not

intend to take away from the district courts, entirely, this jurisdiction over infants, as historically exercised.

■ Legislation establishing juvenile courts and providing methods to deal with delinquent children is a recent product of the solicitude of the law for the welfare of infants, 31 Am.Jur. 785.

"Juvenile courts are generally defined as courts having *special* jurisdiction, of a paternal nature, over delinquent and neglected children." 31 Am.Jur., Sec. 7. (Emphasis ours.)

They are frequently referred to as "specialized courts".

■ We turn again to Section 13 of Article VI of the Constitution and we find immediately after the phrase quoted above, the following language: "and such jurisdiction of special cases and proceedings as may be conferred by law, * * *".

That the juvenile delinquency act deals with special cases and sets up special proceedings, we do not doubt. See Words and Phrases, Permanent Edition, Vol. 39, defining "Special Cases" and "Special Cases and Proceedings". Among these definitions we find the following: "In a proceeding in the domestic relations division of the common pleas court under a complaint alleging that minor child of separated parents was a dependent, a judgment that the child was a dependent and awarding its custody to its father was a 'final order' within meaning of statute defining final orders, as, among other things, an order

affecting a 'substantial right' made in a 'special proceeding'. Gen.Code, §§ 1639-23, 12223-2. In re Anteau, 67 Ohio App. 117, 36 N.E.2d 47, 48."

■■ Article VI, Section 1, of the Constitution, having authorized the legislature to establish juvenile courts, it is within the power of the legislature to confer upon such courts jurisdiction adequate to accomplish the purposes to be achieved. Since conferring of "jurisdiction of special cases and proceedings" is at the disposal of the legislature, we see no constitutional objection to the act of the legislature in conferring original jurisdiction over such special cases and proceedings in the juvenile courts providing the enactment is otherwise within constitutional bounds. That the legislature might confer such original jurisdiction upon district courts is assumed from a reading of Section 13 of Article VI.

As to whether a case might arise where there might appear to be an overlapping or a conflict of the special jurisdiction of the juvenile court, under the enactments involved, and the general jurisdiction of the district courts over infants as historically known, is speculative and not involved in this proceeding, and as to which we express no opinion.

■ We assume that the words "exclusive jurisdiction" when used in the act creating juvenile courts, were intended to apply to the special statutory proceedings set up in the act and not intended to limit or abrogate the jurisdiction of courts of general jurisdiction.

From all the foregoing, we conclude that the petitioner's fourth ground of attack upon the constitutionality of the act is without merit.

Petitioner contends that the only courts which could have been established by law were "county" or municipal courts, as distinguished from district courts, inferior to the established district courts; and that the judges of such courts must of necessity themselves be county officers; that when district judges are named to preside over such juvenile courts Section 13 of Article V of the Constitution, requiring all district, county, precinct and municipal officers to be residents of the political subdivision for which they are elected or appointed, as well as Section 2 of Article X which fixes the term of two years for all county officers and places other restrictions, are violated. In answer to this contention it is suggested that, even conceding, that such juvenile courts must be established "in" or "for" each county, that there is found nowhere in the Constitution any restriction as to who the judge of such court shall be, or the area from which he is to be selected.

Acting upon the assumption that the 1921 amendment creates a juvenile county court (being the only kind, according to his contention, which the legislature is authorized to create), the petitioner next challenges the validity of the act on dual grounds. First, he says the judge of the county court necessarily is a county officer, and, hence, must be a resident of the county in compliance with Article V, Sec. 13, of the Constitution, a condition which a district judge serving ex-officio as judge of the juvenile court could fulfill as to only one county in his district, and, second, that the act collides with a constitutional barrier in that the judge selected by it enjoys a six year term, whereas being a county officer as judge of a county court he is limited to two successive terms of two years each, by Article X, Sec. 2, of the Constitution.

There are thus presented for consideration and decision separate challenges to the existence of the juvenile court itself which, if either be of the effect claimed, will result in a declaration of nullity, all because of the ineligibility of the judge selected to preside over it. And the challenges come, not in a direct proceeding by the state to test, on the grounds urged, the judges' right to sit, but rather from a *private suitor* in a *collateral proceeding* having for its *primary* aim his discharge from a claimed illegal detention, the declaration of nullity to be merely an incidental means of accomplishing the primary end sought.

These challenges do not invoke a consideration on their merits. The judge who sat in judgment on him for all the purposes of that hearing was a real, a de jure judge, even though he may have had only a de facto status. The reasons which close the mouth of a private suitor to such a challenge as that here made have been so well and clearly stated by this court on several occasions that we need only refer to the decisions. State v. Blancett, 24 N.M. 433, 174 P. 207; City of Albuquerque

v. Water Supply Co., 24 N.M. 368, 174 P. 217, 5 A.L.R. 519, decided at the same term as the Blancett case, and Ackerman v. Baird, 42 N.M. 233, 76 P.2d 947, decided since. Suffice it to say, these cases plainly hold it to be the prerogative of the state alone, moving in its sovereign capacity, not that of the private suitor, to initiate and conduct to judgment proceedings fraught with such fateful and weighty consequences as, in the case at bar, for instance, would attend a declaration that a court which has functioned for nearly a quarter of a century, never had any existence at all.

Over this period hundreds of our youth have suffered judgments of juvenile delinquency and been forcibly detained. At the moment, the New Mexico Industrial School for Boys, at Springer, and the Girls Welfare Home at Albuquerque have their quotas of juvenile delinquents forcibly detained for varying periods. If in this proceeding we are to have a declaration that there is no juvenile court, as petitioner contends, and never has been, then hundreds have been, and scores now are, illegally restrained of their liberties. Every inmate of either institution upon proper application should receive his or her discharge and every boy and girl in every county in the state under probation by order of the juvenile court is subject to release therefrom. These are but a few of the serious and weighty consequences to follow a declaration in this proceeding at petitioner's instance of the effect claimed for it, that

there is and never has been a juvenile court.

It is for the state, a sovereign, not for a private suitor, to invite a decision of the questions he raises. Whatever the true rule may be for an application of the de facto doctrine as respects the existence of a de jure office before there can be a de facto officer—and the authorities present a sharp conflict on the subject—this court in City of Albuquerque v. Water Supply Co., supra, approved in Ackerman v. Baird, supra, expressly declined to follow Norton v. Shelby County, 118 U.S. 425, 6 S. Ct. 1121, 30 L.Ed. 178, the leading case, in giving rigid adherence to the condition that there must be a de jure office before there can be a de facto officer. We held, on the contrary, that where uncertainty, chaos and confusion would result if the requirement were rigidly adhered to, public policy forbade upholding the condition. We think this is such a case. For other authorities dealing with the subject and reflecting the conflict see 27 R.C.L., "Public Officers", 591, sec. 312; 15 C.J. 874, sec. 212, 21 C.J.S., Courts, § 144; 11 Am.Jur. 830, sec. 149; 30 Am.Jur. 804, sec. 100, note 16; 140 Am.St.Rep. 164, 184; State v. Pooler, 105 Me. 224, 74 A. 119, 24 L.R.A.,N.S., 408, 134 Am.St.Rep. 543; State ex rel. v. Eveleth, 189 Minn. 229, 249 N.W. 184, 99 A.L.R. 294, 303; Nagel v. Bosworth, 148 Ky. 807, 147 S.W. 940; Beaver v. Hall, 142 Tenn. 416, 217 S.W. 649; Butler v. Phillips, 38 Colo. 378, 88 P. 480; State v. Bailey, 106 Minn. 138, 118 N.W. 676, 19 L.R.A.,N.S., 775, 16 Ann.Cas. 338, 130 Am.

St.Rep. 592; State v. Gardner, 54 Ohio St. 24, 42 N.E. 999, 31 L.R.A. 660; Curtin v. Barton, 139 N.Y. 505, 34 N.E. 1093; 48 Harvard Law Review 1271.

We lay down no hard and fast rule as to when a de jure existence of the office will and when it will not be deemed indispensable to support the status of a de-facto officer. We do think, however, that the same reasons which moved this court in City of Albuquerque v. Water Supply Company and Ackerman v. Baird to apply the de facto doctrine, are present here. Hence, without deciding the broader constitutional questions presented, we give to the judge of the juvenile court a de facto status, thus denying to petitioner the right to challenge his right to sit.

Challenge is further made on the ground that failure to provide for an appeal, and failure to protect against double jeopardy and self-incrimination makes the act unconstitutional—that no due process of law is provided. These objections are all stricken down once we say, as we do, that this is not a criminal proceeding. The authorities generally, we might say almost universally, hold that juvenile court proceedings are entirely different in nature and character from criminal proceedings. We ourselves defined it as a "special statutory proceeding" in State v. Florez et al., 36 N.M. 80, 8 P.2d 786. It has been held in Colorado, one of the states to make early provision for juvenile courts, that "this is a special statutory civil proceeding" and not a criminal action. Kahm v. People, 83 Colo. 300, 264 P. 718, 719. Proceedings under such an act are civil and not criminal, says the court in State ex rel. Berry v. Superior Court, etc., 139 Wash. 1, 245 P. 409, 45 A.L.R. 1530.

The Supreme Court of California held, in the case of Ex parte Leach, 99 Cal.App. 645, 279 P. 157, that proceedings under juvenile court law, except for offenses by persons *other than wards of court,* are not of a criminal nature.

The Supreme Court of Colorado, in the case of Kahm, supra, held that a proceeding to have minors adjudged delinquent is not a criminal action and that the district attorney should not resort to information, but should use the word "petition".

In State v. Zenzen, 178 Minn. 394, 227 N.W. 356, it was held that an appeal does not lie from a decision of juvenile court in proceedings pursuant to statute which do not provide for an appeal.

In Bryant v. Brown, 151 Miss. 398, 118 So. 184, 60 A.L.R. 1325, it was likewise held that a proceeding to commit a minor for delinquency for violation of a law involving moral turpitude is a civil, and not a criminal proceeding. That court further held that the provisions of the State and Federal Constitutions, with reference to voluntary servitude, do not have reference to legitimate authority for the control and education of children.

We know that the Fourteenth Amendment neither implies that all trials must be by jury, nor does it guarantee any

particular form or method of state procedure. Glidden Co. v. Retail Hardware Mutual Fire Ins. Co., 181 Minn. 518, 233 N. W. 310, 77 A.L.R. 616. So, a jury trial is not indispensable to due process. State v. Hanson, 201 Iowa 579, 207 N.W. 769; Wissenberg et al. v. Bradley, 209 Iowa 813, 229 N.W. 205, 67 A.L.R. 1075; Annotation, 67 A.L.R. 1082.

 It is not all offenses for which the person charged is entitled to a jury trial. Guiterrez v. Gober, 43 N.M. 146, 87 P.2d 437. The holdings are almost universal that offenses triable under these juvenile delinquent acts do not entitle the youth to a jury trial. See 31 Am.Jur. 804, par. 38, and cases cited. Of course, this does not apply to those cases as to which our statute specifically authorizes a jury trial. Our statute provides: " * * * and in all cases in which such juvenile delinquent is charged with an offense in which the right of trial by jury is guaranteed, or said juvenile delinquent has disregarded his parole or become incorrigible, the court shall hear the charges against said juvenile delinquent as a committing magistrate, and if bound over, shall be proceeded against in the same manner as provided by law." Sec. 44-111, 1941 Comp.

 The right to a review is not essential to due process of law, but is a matter of grace. Luckenbach S. S. Co. Inc. v. United States, 272 U.S. 533, 47 S.Ct. 186, 71 L.Ed. 394. To the same effect see State of Ohio ex rel. Bryant v. Akron Metropolitan Park Dist. et al., 281 U.S. 74, 50

S.Ct. 228, 74 A.L.R. 710, 66 A.L.R. 1460; De Pauw University v. Brunk, D.C., 53 F.2d 647, affirmed 285 U.S. 527, 52 S.Ct. 405, 76 L.Ed. 924; In re Foote, 129 Misc. 2, 221 N.Y.S. 302; City of Portland v. Mima Corporation, 132 Or. 660, 285 P. 815; Beacon Lumber Co. v. Brown, Tex.Com. App., 14 S.W.2d 1022; Rudacille v. State Comm. on Conservation and Development, etc., 155 Va. 808, 156 S.E. 829; Ex parte Packer, 136 Or. 159, 298 P. 234.

"Appeals are creatures of statute, and, when not guaranteed by constitutional provisions, or specifically provided for by statute, no power of review is afforded to a litigant in a cause determined by an inferior court. The Supreme Court of this state has only such jurisdiction as is conferred by the Constitution, and the laws of the State not in conflict therewith. * * *" State v. Chacon, 19 N.M. 456, 145 P. 125, 126. See also State v. Rosenwald, 23 N.M. 578, 170 P. 42, and State v. Dallas, 22 N.M. 392, 163 P. 252.

 As we have said, this not being a criminal proceeding, most of the authorities relied upon by petitioner are not applicable. Due process of law is afforded although there be no right of trial by jury and no appeal, and notwithstanding the requirements as to notice to the child and its parent, or guardian, are somewhat informally set out.

Upon the question of self-incrimination, the authorities relied upon are likewise not in point since we are dealing with a special statutory civil proceeding and not a criminal statute, so far as the case of the

juvenile itself is concerned. And, likewise, the point that there can be no protection against double jeopardy because there is no requirement for a record of the evidence upon which the finding and judgment of the juvenile court rests, is without merit. The juvenile has never been in jeopardy, when tried for delinquency merely, and would not, in such case have been proceeded against for any specific crime, although one or more specific offenses might have been the foundation for the court's finding and judgment that he was a juvenile delinquent and should be so adjudged. Upon this point, however, more is to be said hereafter in making final disposition of this case.

 With respect to double jeopardy, it is essential, under common law and various constitutional provisions declaratory thereof, that the second prosecution be for the same act and crime both in law and fact for which the first prosecution was instituted; and it must appear that the defendant upon the first charge could have been convicted upon the offense in the second. These are elementary principles. See 15 Am.Jur. 53, par. 380. Cases upon the question of what is and what is not jeopardy are so numerous, and the law so well settled, that citation of further authority is deemed unnecessary. Once the distinction between this character of proceeding and a criminal prosecution is clearly sensed, a distinction which seems not to impress itself upon petitioner, many of the questions found in the various points urged in support of the unconstitutionality of the statute are easily disposed of.

Our act specifically provides, if indeed the caution would be required, "in no case shall an order adjudging a person to be a ward of the juvenile court be deemed to be a conviction of crime". Sec. 107 of Chapter 44, supra. None of the reasons advanced by petitioner, even though most of them might be applicable if this is to be treated as a criminal proceeding, can apply here. The case of Wissenberg v. Bradley, 209 Iowa 813, 229 N.W. 205, 207, 67 A.L.R. 1075, apparently a leading case on the question, deserves to be referred to more fully, but we quote only briefly from a portion of the opinion, authored by Mr. Justice Faville: "Statutes of this general character have been characterized by the courts as progressive and humanitarian. * * * Some courts refer to them as paternal and benevolent. * * * Such statutes are *not criminal* or *penal*. They are not intended as a punishment, but are calculated to save the child from becoming a criminal. * * *" (Emphasis ours)

" * * * these statutes, instead of attempting to punish juvenile offenders for misconduct, criminal or otherwise, try to remove them from the path of temptation, and by preventive and corrective means seek to direct them in the paths of rectitude". In re Turner, 94 Kan. 115, 145 P. 871, 872, Ann.Cas.1916E, 1022.

 We know that the provisions of the State and Federal Constitutions relating to involuntary servitude do not have reference to the legitimate authority for the control and education of children. "A

child may be subjected to restraints that may be necessary for his proper education and discipline that could not be applied to adults." 31 Am.Jur. 787, par. 6; Bryant v. Brown, 151 Miss. 398, 118 So. 184, 60 A.L. R. 1325, 1342. And so, it has been held that although unequal penalties are imposed, as between juveniles and adults, this does not offend against the rule that unequal penalties may not be imposed. Com. v. Pear, 183 Mass. 242, 66 N.E. 719, 67 L.R.A. 935. Children disciplined and controlled under such acts are not deprived of the equal protection of the law or of due process of law. Bryant v. Brown, supra.

The courts, quite uniformly, in distinguishing such proceedings from ordinary criminal prosecutions, bottom their decisions as to the constitutionality of such acts upon the premise that the state is thus exercising an inherent power as parens patriae to interfere, on behalf of the child, including such interference between them and their parents, when the morals, safety or interests of the children require it. In re Ferrier, 103 Ill. 367, 42 Am.Rep. 10; In re Turner, supra, 94 Kan. 115, 145 P. 871, Ann.Cas.1916E, 1022; Farnham v. Pierce, 141 Mass. 203, 6 N.E. 830, 55 Am.Rep. 452; State ex rel. Olson v. Brown, 50 Minn. 353, 52 N.W. 935, 16 L.R.A. 691, 36 Am.St.Rep. 651; In re Knowack, 158 N.Y. 482, 53 N.E. 676, 44 L.R.A. 699; Prescott v. State, 19 Ohio St. 184, 2 Am.Rep. 388; Milwaukee Industrial School v. Milwaukee County, etc., 40 Wis. 328, 22 Am.Rep. 702; Annotation 60 A.L.R. 1342.

Language used by the court in Wisconsin Industrial School v. Clark County, 103 Wis. 651, 79 N.W. 422, 426, seems to express rather clearly the prevailing philosophy governing in such cases. The language we here quote was set out, in part at least, and approved in the well-reasoned case of Wissenberg v. Bradley, heretofore referred to in this opinion. We quote from the Wisconsin case: "* * * The power to place children under proper guardianship has been exercised by chancellors and judges exercising chancery powers from time immemorial. Said Lord Riddesdale in 1828, in Wellesley v. Wellesley, 2 Bligh (N.S.) 124, the right of a chancellor to exercise such power has not been questioned for 150 years. Such a proceeding is not a trial for an offense requiring a common-law, or any, jury. It was never so regarded in England, nor has it been in this country in but few instances, notably cases in New Hampshire and in People v. Turner, 55 Ill. 280 [8 Am.Rep. 645]. That case was in effect overruled by later cases and is not now considered as authority. Petition of Ferrier, 103 Ill. 367, [43 Am.Rep. 10]; McLean Co. v. Humphreys, 104 Ill. 378. As said, in substance, in the Ferrier case, the proceeding is not one according to the course of the common law in which the right of trial by jury is guarantied, but a *mere statutory proceeding* for the accomplishment of the protection of the helpless, which object was accomplished before the constitution without the enjoyment of a jury trial. There is no restraint

upon the natural liberty of children contemplated by such a law,—none whatever; but rather the placing of them under the natural restraint, so far as practicable, * * *. It is the mere conferring upon them that protection to which, under the circumstances, they are entitled as a matter of right. * * * The design is not punishment, nor the restraint imprisonment, any more than is the wholesome restraint which a parent exercises over his child. * * * No constitutional right is violated, but one of the most important duties' which organized society owes to its helpless members is performed just in the measure that the law is framed with wisdom and is carefully administered. * * *"

Nor are we intrigued by the argument of counsel for petitioner when he says in urging the inequality of the law, that by Article II of Chapter 44 of the 1941 Comp., which deals with dependent and neglected children, full and complete safeguards are provided which will meet any challenge to the constitutionality of that act. That is to say, in the said last above-mentioned act violations thereof are prosecuted upon information by the district attorney, a jury trial is permitted and the procedure generally is, as to the ordinary constitutional safeguards at least, the same as that attending upon any criminal suit in the district court. The failure to so provide in the Juvenile Delinquent Act, petitioner urges, violates the equal protection clause of the Constitution. Counsel seems not to sense, as we do, that these two acts, one dealing with juvenile delinquents and the other with dependent and neglected children, seek to reach and control two distinct problems, clearly different in most respects.

Some statutes deal with these two classes of cases in separate acts and provide wholly separate procedure, while others provide that juvenile courts may determine certain, or all, questions arising as to both classes, that of the dependent and neglected as well as the delinquent child.

Our own legislature has sought to deal with the problems separately, and we are not prepared to say unwisely. See Holton v. Sampson, 81 Neb. 30, 115 N.W. 545, wherein it is held that the two acts, one providing for custody and control of children not properly cared for, and the other having to do with the correction, discipline and control of delinquents, are not inconsistent since somewhat, though not wholly, different problems are dealt with by each act, and that no repeal of the earlier act is effected by the enactment of the subsequent one.

"The reason for a different procedure in neglect cases and delinquency cases is obvious. In a neglect case only the proper custody and support of the child are involved, * * *". Ex parte Naccarat, 328 Mo. 722, 41 S.W.2d 176, 177, 76 A.L.R. 654.

A neglected and dependent child is not necessarily a delinquent child, though frequently he becomes one if neglect continues; and, indeed, he may be at one and the same time, both. But the legislature has seen fit to enact distinct legislation con-

trolling the problems presented by each class of cases, and we are not prepared to say it may not do so, that the classification it seeks to make and the distinction it draws between the *dependent* and *neglected* child and the *delinquent* one, is not reasonable.

There are many reasons which might be suggested in support of the judgment of the legislature in its desire to provide the conventional procedural machinery, including trial by jury and appeal, in the case of children merely dependent and neglected, as it affects the parents or guardian as well as the child, which would not be deemed necessary or desirable for delinquents. In the case of dependent and neglected children, the permanent custody and control of the child is often involved; even adoption by strangers will be authorized and ordered where the best interest of the child requires it. Blanchard v. State ex rel Wallace, 30 N.M. 459, 238 P. 1004. And, while the parent has no property right in its child, it has, prima facie, the right to its custody (Hill v. Patton, 43 N.M. 21, 85 P.2d 75), but it is not a paramount right and must give way to other claims when the best interest of the child demands it. Pra v. Gherardini, 34 N.M. 587, 286 P. 828. The child may thus forever be lost to the natural parents; and it comports with that careful consideration which the lawmakers must have given the subject, when they wrote into that act these particular safeguards.

On the other hand, the jurisdiction of juvenile courts over delinquents as such, is exercised for purposes substantially, though not entirely, different, as we have shown. True, the welfare of the child is the paramount question involved in both cases; yet, in the one case it is, theoretically at least, one of food, clothing, a home, healthy surroundings and proper parental care. In the other, the case of the delinquent child, it is something else.

We now refer further to the point so vigorously and ably urged to the effect that the act is so indefinite and uncertain in its terms as to deny due process of law. This challenge, as we understand it, goes to the question of notice of hearing and service thereof; to the indefinite character of the portion of the act having to do with the order to be issued for the arrest of the parent or the juvenile upon failure to appear, and to the language used in designating the juvenile in question, which, it is asserted, uses the term "juvenile delinquents" to designate the person involved before arrest, after hearing and before sentence as well as after determination of its status and sentence, etc.

Reliance upon this contention is without merit. It might be suggested that if the word "alleged" were used with the word "delinquent" in describing the juvenile not yet determined to be a delinquent, petitioner's objection would be substantially met.

The challenge then goes on and urges consideration of the fact that though a hearing is required before the judge may determine the delinquency of the juvenile before him there is no method prescribed or

suggested as to how the hearing is to be held, the manner of its conduct or the procedure governing; specifically, that no record of the evidence is required to be kept. Petitioner again mistakes the nature and purpose of such proceedings. Due process of law, under the circumstances, is not offended against in any of these particulars.

 As to the indefiniteness of the statute as to service of the notice required, the question is also without merit, even though petitioner might raise it, which he cannot. It is not disputed that the parent had notice in the instant case, that he was in court and was permitted to participate in the proceedings. Without deciding what consideration we would give to entire lack of notice, we might point out that most cases treating the subject hold that no particular form of notice to the parent is required; others that the child may be brought before juvenile judges either upon summons or warrant of arrest. The important thing is that some reasonable notice be given and that a hearing, though informal it may be, must be held. On notice to, or consent of, parents, see: Bryant v. Brown, supra; State v. Cagle, 111 S.C. 548, 96 S.E. 291; People ex rel. Zeese v. Masten, 79 Hun 580, 29 N.Y.S. 891; Allen v. Williams, 31 Idaho 309, 171 P. 493; Cincinnati House of Refuge v. Ryan, 37 Ohio St. 197; Milwaukee Industrial School v. Milwaukee County, 40 Wis. 328, 22 Am.Rep. 702; Wilkison v. Children's Guardian, 158 Ind. 1, 62 N.E. 481.

Ex parte Naccarat, supra, holds that a child might be brought before the court for a hearing on the charge upon "a summons, requiring the child and the person or persons having custody or control of the child * * * to appear with the child at the place and at the time set in the summons * * *. The issuance of such a summons is *not* jurisdictional in delinquency cases * * *. The court is authorized, in delinquency cases, to cause the child to be arrested and brought before it on a warrant * * *".

 As is suggested in a number of cases, if a parent is not a party to the proceeding or if he may, in fact, have no notice when his child is proceeded against, under the conventional juvenile delinquent act, such parent's right, whatever it may be, is not foreclosed to thereafter litigate such right. As was well stated in the case of Ex parte Sharp, 15 Idaho 120, 96 P. 563, 565, 18 L.R.A.,N.S., 886: "Now, as for the contention that the parent is deprived of the natural right to the custody and care of the child, we think that proposition is answered sufficiently and satisfactorily in this manner: If the parent objects to the child's being taken care of by the state in the manner provided for by the act, he may appear and present his objections. If, on the other hand, he is not made a party to the hearing and proceeding, under all the recognized rules of legal procedure, he is clearly not bound by the judgment, and none of his rights are precluded. If he desires to contest the state's right to take the steps it has

taken, he has his remedy in the courts to contest that right, and adjudicate his own rights as fully and completely as if no order had been made with reference to the child. * * * The order and judgment committing the child to the Industrial Training School does not run against the parent, and does not determine any of his rights in that respect. * * *"

Finally, it is vigorously urged by petitioner that, under the provisions of 1941 Comp., Sec. 44-111, since he is charged with an offense in which the right to trial by jury is guaranteed, the juvenile court had no jurisdiction to do more than sit and act as a committing magistrate. The section of the statute thus relied upon reads: "The juvenile court shall have power to parole at any time before or after sentence, any juvenile delinquent under the care of the probation officer or any other suitable person or institution, who shall cause said juvenile delinquent to return or report to the court, or a referee thereof, at such time or times as the court may order, and during such probationary period such juvenile delinquent shall be under the jurisdiction of said juvenile court and shall be subject to such reasonable rules and regulations touching the welfare of such juvenile delinquent as may be prescribed by the court. In case such juvenile delinquent shall disregard the terms of his parole or shall be incorrigible, said juvenile court shall have full power to cause such juvenile delinquent to be brought before it for trial and to award such sentence as the law may authorize, and in all cases in which such juvenile delinquent is charged with an offense in which the right of trial by jury is guaranteed or said juvenile delinquent has disregarded his parole or become incorrigible, the court shall hear the charges against said juvenile delinquent as a committing magistrate, and if bound over, shall be proceeded against in the same manner as provided by law."

It is claimed that since petitioner is charged "with juvenile delinquency in that he did take indecent liberties with ———, a female minor", that there is thus charged an offense for which the right of trial by jury has been guaranteed. It is pointed out that section 41-3401, 1941 Comp., makes lewdness a criminal offense and that the following section defines the term as including "any indecent or obscene act". The penalty provision of the Act provides for punishment in the event one is found guilty in the second degree by imprisonment for not more than a year. Thus, if this were a prosecution for the crime, as distinguished from the adjudication of the status of juvenile delinquency, the right to trial by jury has been guaranteed. All parties concede this.

However, the attorney general urges upon us a consideration of the point that the concluding sentence of Section 44-111 has no reference to juvenile delinquents, as such, but only to *incorrigible juvenile delinquents*. An incorrigible juvenile delinquent is defined by the Act (Sec. 44-101) to be "any juvenile delinquent who shall wilfully violate his parole,

or who shall, after being discharged from parole or sentence of the court, wilfully violate any other provisions of Section 1 of this Act." It is clear that if this last sentence found in Section 44-111, starting with the language "In case such * * *", has reference only to such incorrigible juvenile delinquent, as distinguished from the delinquent who has not wilfully violated his parole, or, having been discharged from parole or sentence has wilfully violated any of the provisions of Section 1 of the Act, then the Act has no application to petitioner. Petitioner would thus be before the court as a first offender and no question of incorrigibility, as defined by the Act, would be involved. We agree with the Attorney General's contention.

Petitioner is not in a position to complain that he was entitled to a trial by jury since that portion of the section providing for such proceedings has application to a distinct class of juvenile delinquents within which class he does not fall. This latter portion of Section 44-111 was enacted to meet an entirely different situation, and a distinct problem, whatever may be said of the inappropriateness of some of the language used to express the purpose or of the seeming conflict between certain portions of the section.

It may be said that, in any event, the first half of this section confers ample jurisdiction upon juvenile courts to discipline, restrain and direct the training of the youth charged to be, or adjudicated, delinquent; and, that the last half of the section, if not in fact understandable, cannot offend as to the rest of the section, or the act as a whole, since such portion is clearly separable. This section has been the subject of earnest and prolonged discussion on the part of counsel and among members of the court in conference. We deem it unnecessary to say more here than that, in the first place, petitioner does not come within the provisions of the criticised portion of the section; and, in the next place, however inappropriately phrased, the section is not so indefinite as to compel a holding that, under the circumstances it was obviously enacted to meet, it cannot be applied. It is not an easy task to bring order out of confusion from the language found in this latter half of the section; but, when we say, as we do, that it purports to deal only with a class of juvenile delinquents within which class petitioner does not fall, and in addition, that the provisions of such sections so complained of are so separable from the rest of the section and the Act as a whole that if such portion of this section were struck down the remainder of the Act would remain, the petitioner's argument fails.

The only reasonable meaning which we can deduce from the language here so inappropriately employed is that the juvenile delinquent who by his conduct, has placed himself within the statutory definition of "incorrigible", if so adjudged, must be proceeded against criminally, and a juvenile court would, under this section, have jurisdiction only to sit

as a committing magistrate. The obvious intention of the legislature was to subject such a one, if adjudged "incorrigible", to the criminal law, as distinguished from the case of the ordinary juvenile delinquent who has not violated the condition of his parole or who has not committed any proscribed offense subsequent to discharge from parole or sentence by the juvenile court.

It might be contended that to so hold upon this point places the "incorrigible" youth, the second offender, beyond the jurisdiction of the juvenile court wherein he may be disciplined, or guided and directed as a delinquent merely; that now, the youth having had his one chance, the juvenile judge must step aside and let the criminal law take its own harsh, and somewhat unyielding course. One chance, and one chance only, is not quite consistent with the elements of patience and forgiveness which we believe to be desirable attributes of juvenile delinquency jurisprudence, it may be said.

Such a view is less objectionable, however, than to say that the Act would deprive the juvenile court of all jurisdiction in cases where the charge that the juvenile is a delinquent is based upon facts showing commission of an offense in which a trial by jury is guaranteed, or even to subject such a one to the ordeal of a conventional public trial by jury. This would be the inescapable holding if the section in question could be applied to any and all juveniles charged with delinquency as con-

tended for by petitioner. This view at least gives the first offending juvenile one chance to avoid the stigma and ignominy of conviction after prosecution at public trial. The alternative suggested would deny this one chance in perhaps ninety per cent of juvenile cases.

We should resolve every reasonable doubt against an interpretation of the statute that would invariably compel a public trial under the relentless and stern prosecution by a district attorney of a delinquent of tender years. That the juvenile judge might still have the unimportant and formal task of passing "sentence", or granting parole, after the verdict of "guilty", would scarcely suffice more than as a mere gesture after the damage had been wrought by such a public prosecution. All the reasons which may be advanced in support of the juvenile court as an institution would be neutralized by such a spectacle. We favor a construction which, in so far as the law and the Constitution permit, will minimize this result as against one which compels it in a vast majority of juvenile cases.

And it may be that neither theory points to a desirable method of treating juvenile delinquents. But we must take the statute as we find it. Any plea for improvement in this respect must be addressed to the wisdom of the legislature.

All we have said upon this question is with a consciousness of the duty enjoined upon us to support the constitutionality of an act of the legislature where

such is reasonably possible. As we said in State ex rel. Clancy v. Hall, etc., 23 N.M. 422, 427, 168 P. 715, 717: "When a statute is before the court for construction, and the language of the act is reasonably susceptible of two constructions, one of which would render the act inoperative and in contravention of the Constitution or law of the land, and the other would uphold the statute, it is the duty of the court to adopt the latter construction. * * * It is the duty of the court, where in doubt * * * to resolve the doubt in favor of the constitutionality of the act. * * *"

This rule is to be applied even though the interpretation followed is not the more natural one which the language would support. 26 Amer. & Eng. Encyc. of Law, 640. See also State v. Sargent, supra; State v. Safford, 28 N.M. 531, 214 P. 759, supra; Asplund v. Alarid, supra; State v. Eldodt, supra.

It is our conclusion that the writ should be discharged and the petitioner remanded to the proper authorities, and it is so ordered.

SADLER and BRICE, JJ., concur.

ZINN, C. J., being absent, did not participate.

BICKLEY, Justice (dissenting).

I cannot concur in the foregoing opinion. The Assistant Attorney General asserts that more than 80% of the cases the juvenile courts have to deal with are where the juvenile delinquents have committed crimes or misdemeanors, which "offenses" are made the basis of adjudication of juvenile delinquents.

If this is so, it seems logical to ascribe to the legislature an intent to deal especially with this class, as distinguished from those who merely grow up in idleness or those who visit dram shops, or wander the streets in the nighttime, or hook rides on moving trains or use profane language in public places, or are habitually absent from school. To my mind the legislature did do so. The word "sentence" is defined in Black's law dictionary as follows: "The judgment formally pronounced by the court, or judge upon defendant after his conviction in a criminal prosecution awarding the punishment to be inflicted. The word is properly confined to this meaning."

Section 1 of the act says: "A juvenile delinquent is declared to be anyone under the age of 18 years who violates any law (s) of this state," etc.

It may be that the juvenile court if established by Ch. 87, Laws of 1921, has exclusive jurisdiction "over juvenile delinquents * * * and over all matters arising under this act." But we must look elsewhere to find the laws, the violations of which constitute juvenile delinquency and the manner of determination of whether a person under the age of 18 years "violates any law of this state",

and we find that such determination is not within the exclusive jurisdiction of the juvenile court. The jurisdiction to determine such fact of law violation and to "sentence" if conviction follows is by our laws reposed in the district court, justices of the peace courts and such courts inferior to the district courts as may be established by law and endowed by law with such jurisdiction. There is not the slightest indication in the juvenile delinquency act that the jurisdiction of the district court and justices of the peace courts to try and convict and sentence one who violates a law of this state was abrogated.

Therefore, when an affidavit charging an offense provided for in Sec. 4 of the act, i. e. containing "a statement of the facts bringing the juvenile delinquent within the provisions of this act" is filed with the clerk of the juvenile court, and it appears that the facts so alleged are that the juvenile has violated a law of this state, it readily appears that the juvenile court is not limited in its jurisdiction to those cases where the juvenile has never before been convicted of law violations.

The proof of law violations may consist of the record of convictions in the district court and in the courts of justices of the peace. So, Sec. 9 of the act is careful to not exclude the jurisdiction of the juvenile court by reason of the circumstance that "sentence" has been imposed by some other court. The first words of that section are: "The juvenile court shall have power to parole at any time before or after sentence, any juvenile delinquent."

If the opinion of the majority means that this signifies "before or after sentence by the juvenile court" *only,* an unwarranted limitation is imposed upon the power of the juvenile court, because we see in Sec. 8 that "The district court of each county shall have power to cause any case against a person under the age of 16 years to be transferred to the juvenile court docket, after which the same proceedings shall be had as provided in this act for juvenile delinquents."

It seems more likely that the legislature meant "before or after sentence" by any court having power to sentence, including the juvenile court.

Counsel for each of the parties at the oral argument conceded that the juvenile court has power to "sentence" for law violations providing such violations are *petty offenses* in which trial by jury is not guaranteed, and the majority say that the juvenile court may sentence for something or other, but are not very definite as to what.

Since Sec. 23 of Art. 6 of the Constitution authorizes the legislature to confer jurisdiction on probate courts for the trial of misdemeanors in which the punishment cannot be imprisonment in the penitentiary, etc., and in view of the provisions of Sec. 1 of Art. 6 of the Constitution, it is not unreasonable to suppose that jurisdiction

was reposed by the legislature in juvènile courts to try and convict and sentence and parole in cases of petty offenses against the laws of this state.

That such jurisdiction is reposed in the juvenile courts, concurrently to a degree with other courts I do not doubt. For what other reason is the juvenile court endowed with the power to "punish" juvenile delinquents? This view is further supported by the title of the act which contains the phrase: "An Act Defining Juvenile Delinquents, Providing for their *Punishment*."

It thus appears that the juvenile court has a conventional jurisdiction to deal with those charged with petty offenses against the laws of this state, plus additional powers not residing in other courts. If the power to hear and determine charges that petty offenses against laws of this state have been committed, and to punish for such violations by "sentence" is incident only to adjudication of status of delinquency the argument is the same.

The legislature was doubtless conversant with the provisions of the Constitution and it seems were alert thereto, because they provided in the same Sec. 9 that "In *all* cases in which the right of trial by jury is guaranteed, the juvenile court shall hear the charges against said juvenile delinquent as a committing magistrate.". It seems plain, therefore, that in a case where the sole "charges" are that a juvenile has "violated a law of this state" in which a trial by jury is guaranteed, the power of

the juvenile court to parole and subject to rules and regulations touching the welfare of said juvenile delinquent law violator before or after sentence is limited to before or after sentence by the district court in such cases as may have been transferred to it by the district court under the provisions of Sec. 8 or before or after sentence by a justice of the peace court or before or after sentence in the juvenile court.

By this construction some significance may be given to the phrase "In case such juvenile delinquent shall disregard the terms of his parole or shall be incorrigible, said juvenile court shall have full power to cause such juvenile delinquent to be brought before it for trial and to award such sentence as the law may authorize." This embraces both first offenders and repeaters and parole violators, etc., provided always that the limitation is observed that if the juvenile "is charged with an offense in which the right of trial by jury is guaranteed the court shall hear the charges against said juvenile delinquent as a committing magistrate."

Since the meaning of the word "sentence" as we have seen is properly confined to judgment pronounced after conviction, and conviction being for violation of law, the law pertaining to the particular offense and fixing the penalties therefor is what must be looked to in order to discover what sentence the law authorizes and this is the only meaning which can be given to the phrase "and to award such sentence as the law may authorize."

In cases where the juvenile court has taken jurisdiction after sentence and has paroled the delinquent, the sentence itself will be what the law authorizes the juvenile court to award. If the juvenile court takes jurisdiction to determine juvenile delinquency before sentence upon the sole ground that the juvenile has violated a law of this state, and there is a parole and a disregard thereof, etc., the penalty provided in the statute for the particular law violation will be what the law authorizes the juvenile court to award.

I am unable to discover any "sentence" which the law authorizes for wandering the streets at night, using bad language in public places, hooking rides on moving trains, or habitual failure to attend school. So, I find in this clause support to the view that Secs. 8 and 9 relate to juvenile delinquency based on law violation, with the result that where the law violations are *petty offenses* the juvenile court may determine whether the juvenile delinquent is guilty and may parole either before or after sentence by the juvenile court, and in cases where the charge is the violation of a law in which the right of trial by jury is not guaranteed, and some other court has found the juvenile guilty of a petty offense, the juvenile court may exercise its parole and regulatory powers before or after sentence by such court which has jurisdiction to try offenses in which the right of trial by jury is not guaranteed.

But in cases where the alleged juvenile delinquency is based solely upon charges of violation of a law in which the right of trial by jury is guaranteed, the juvenile court will acquire jurisdiction to parole only such juvenile delinquent as has been accorded a jury trial, if demanded, in the district court and found guilty, because the district court is the only court that has power to try and determine charges of offenses in which a trial by jury is guaranteed. After there has been a trial of a person under the age of eighteen years in the district court, with a jury, or without a jury if a jury is waived, the district court may either before or after sentence send the case to the juvenile court where such juvenile delinquent law violator may be dealt with as provided by the juvenile delinquent act, provided the juvenile is under the age of *sixteen* years, as provided in Sec. 8 of the act.

It is to be observed that Sec. 9 does not say that the juvenile delinquent may be paroled before or after trial. The power to sentence implies that there has been a trial.

If we give to the words "sentence" and "parole" the meaning ordinarily understood, as we are required by the rules of statutory construction, Sec. 9 makes sense. "'Sentence' as commonly used, meaning the decree or order by which the court imposes punishment or penalty upon a person found guilty, or the punishment or penalty imposed, and the word 'parole' indicating the act is confined to criminal proceedings." 31 Words and Phrases, Perm. Ed., "Parole", Page 103.

We are not without aid in discovering the meaning of the phrase "one who vio-

lates any law of this state" as used in Sec. 1, and "offense" as employed in Sec. 9.

In Meyers v. State, 193 Wis. 126, 213 N.W. 645, 646, it was decided that the terms "offense" and "violation" used in repeater statutes means conviction of an offense, the court saying, "The terms 'offense' and 'violation,' as used in those statutes, unquestionably mean convictions of an offense."

The expression in Sec. 5: "In no case shall an order adjudging a person to be a ward of the juvenile court be deemed to be a conviction of a crime." does not help us much. There will be instances when a juvenile delinquent may be adjudged to be such for one of a dozen causes mentioned in Sec. 1 which are not violations of any law of this state. There might be another reason for inserting the quoted language in Sec. 5. A juvenile delinquent who has been convicted of violating a law of this state will not be able because of such language to plead former jeopardy by reason of such conviction against a proceeding to secure an order adjudging him a ward of the juvenile court.

The construction for which I contend finds support in legislative construction in Ch. 86, Laws of 1919, just two years after the enactment of the juvenile delinquency act when the subject was fresh in the minds of the legislators. Sec. 3 of Ch. 86, Laws of 1919, states as follows: "The District Courts may, in their discretion commit to the said Board *as wards of the court,* for

terms not exceeding the minority of such girls, girls under the age of eighteen years *who have been convicted* of felonies less than murder, or of misdemeanors, or who are incorrigible, associate with thieves, or vicious or immoral persons or who are growing up in idleness, or who frequent places of prostitution, or who wander the streets at night without lawful business or occupation, or who habitually use vile, obscene, vulgar, profane or indecent language in public places, or who habitually violate the compulsory school law, or who are guilty of immoral conduct in public places, but nothing herein contained shall affect any of the provisions of Chapters four and eighty-five, Laws of 1917, this act being cumulative thereto." (Emphasis supplied.)

The phrase in the foregoing section "who have been *convicted* of felonies less than murder, or of misdemeanors" is significant as indicating a legislative understanding that nothing short of a conviction will suffice where the sole offense charged is a violation of a law of the state. Nothing is said of "conviction" of the bad conduct and practices enumerated in the latter portion of the section. To my mind, there is indicated by these many guide posts that the legislature entertained the conventional idea that it is a more serious consequence to adjudge a juvenile to be a law violator as a basis for adjudging him a juvenile delinquent than it is to so adjudicate upon the basis of a showing and finding of bad habits merely, and preserved the right of the alleged law

violator to have the verdict of a jury that he is guilty of having violated a law of this state (in cases in which the right of trial by jury is guaranteed) before an inferior or any court could deprive him of his liberty. In other words, the juvenile court is sufficient arbiter as to the peccadillos and a jury has the first say as to certain serious crimes, unless a jury is waived.

I do not agree with the majority in ascribing to the legislature the harsh intention of relinquishing efforts of reform of a juvenile delinquent at the point of the commission of a second offense, or a parole violation.

I think that the provisions in Section 9 in recognition of the constitutional right of trial by jury in certain cases was not a gesture of impatience with the parole violator or one who after being discharged from "parole or sentence of the court wilfully violates any of the provisions of Sec. 1 of this act", indicating a desire that such juvenile be further punished by being "proceeded against criminally." In other words, a jury trial in a case in which "the right of trial by jury is guaranteed" is not generally regarded as a penalty for disobedience but as a substantial constitutional privilege. To my mind the insertion in Sec. 9 of the clause "and in all cases in which such juvenile delinquent is charged with an offense in which right of trial by jury is guaranteed, the court shall hear the charges against said juvenile delinquent as a committing magis-

trate", was to buttress the act against attacks on the grounds of unconstitutionality.

I am unable to agree with the view of the majority that the legislature intended to withhold the right of trial by jury from the first offender and accord it to only second offenders and parole violators. It seems singular that the repeater, or the incorrigible, must be relegated to the district court where he could have a jury trial, unless waived, with the attendant right if convicted, of an appeal to the Supreme Court, whereas the novice must go without a jury trial and without an appeal.

The phrase "committing magistrate" was defined in State v. Rogers, 31 N.M. 485, 247 P. 828, 833, to mean one who on probable evidence commits for trial or requires bail, and it seems to be more appropriately employed with reference to one who has not been theretofore tried. The phrase "and if bound over shall be proceeded against in the same manner as provided by law" might mean that in a case which had been tried in the district court and after sentence the case had been transferred to the juvenile court docket, pursuant to Sec. 8, and the juvenile delinquent thus brought under the jurisdiction of the juvenile court had visited a public pool hall contrary to Sec. 1 of the act, the juvenile court could bind him over to the district court but there would not then be a trial in the district court and nothing further to be done by the district court except to execute the sentence. But the ordinary meaning of the phrase "com-

mitting magistrate", particularly in connection with the attendant language "and in all cases in which said juvenile delinquent is charged with an ' offense in which the right of trial by jury is guaranteed" means commit for trial, as we said in State v. Rogers, supra.

Or suppose the district court after trial but *before sentence* has transferred a case to the juvenile court and the juvenile delinquent had been paroled by the juvenile court and he had violated his parole, what occasion would there be for the juvenile court to act merely as a committing magistrate and bind the offender over to the district court where nothing further would be required to be done in the matter except to "sentence" the parole violator? There would seem to be no occasion for such an idle procedure since Sec. 9 gives the juvenile court "full power to cause such juvenile delinquent to be brought before it for trial and award such sentence as the law may authorize."

The foregoing, and other considerations heretofore mentioned confirm me in the view that the restraint and limitation upon the juvenile court judge means that he shall only act as a committing magistrate in *all cases* where the juvenile delinquent is charged with an offense in which the trial by jury is guaranteed, and hear the charges as an examining court only.

The majority say: "We should resolve every reasonable doubt against an interpretation of the statute that would invariably compel a public trial under the relentless and stern prosecution by a district attorney of a delinquent of tender years." Unless the majority mean to hold that the criminal laws of our state have been abrogated and that since the enactment of the juvenile delinquent act, district courts and justice of the peace courts no longer have jurisdiction to enforce such criminal laws if the offender is under 18 years of age, then it has been and still is possible that a case might get into those courts before it gets into the juvenile courts.

Since it is the duty of the district attorney acting as juvenile court attorney to represent the State in all matters involving juvenile delinquency, it is difficult to see how the juvenile delinquent is to be immune from the relentless and stern district attorney even in the juvenile court.

The majority say: "This view [the view adopted] at least gives the first offending juvenile one chance to avoid the stigma and ignominy of conviction after prosecution at public trial." A little consideration of the meaning of the word "conviction" will be helpful in appraising the value of the pronouncement last quoted. In Words and Phrases, Perm.Ed. Vol. 9, Page 594 et seq., are gathered many different definitions of the word conviction and at Page 596 are a number of citations to definitions by the courts to the effect that a conviction is an "adjudication of guilt." Other definitions are a "finding of guilt." Since before a juvenile

may be declared to be a juvenile delinquent on the ground that he has violated a law of this state it must be adjudicated by the juvenile court that he is guilty of having violated such a law, it is difficult to attach any particularly baleful meaning to the word conviction. Perhaps some disabilities may follow in the one case that do not in the other.

In recalling that juvenile courts are required to keep records in which all orders and judgments given by the court shall be entered and hearings may be public, it is difficult to see how the "stigma and ignominy" of an order or judgment that the accused is a juvenile delinquent because he has violated a law of this state amounting to an infamous or felonious crime or a misdemeanor of the graver sort is any less in one forum than another.

The sentiment of the majority heretofore quoted indicating a desire that the sensibilities of the juvenile delinquent be protected does credit to the kind-heartedness of its sponsors but is of doubtful value as an aid to construction. Let it be remembered that we are here considering only that class of offenders who are charged with having committed offenses for which a trial by jury is guaranteed. They will not be bound over to the district court unless the juvenile court judge is convinced that there is probable cause to believe that they are guilty as charged. It is the observation of many students of life that young and generous minds, uncontaminated with vice, unsullied and un-

stained by contact with the evil practices of life, without previous training in the contemplation of crime, do not at once, while in a healthy state, plunge into the commission of those offenses for which a trial by jury is guaranteed. It is to be doubted that it will often happen that the sensibilities of such offenders will recoil at the stern and relentless methods of the district attorney. Anyway, the matter is in the hands of the alleged offender. It will usually be those who assert innocence who demand a jury trial. It is theirs to demand or waive. The legislature sought to preserve this right and we cannot take it away however much we might think it would be better for those of tender years if the constitutional guaranty had been omitted as to them. But since one of tender years charged with violating laws of this state must confront the district attorney in the juvenile court where the state is endeavoring to have him declared a juvenile delinquent, he may consider whether he wishes the judge or the jury to determine whether he is guilty or not.

It seems likely that the juvenile court will have plenty to do, with those who do not demand a jury trial.

Judge Jesse Olney of the San Bernardino (California) County Bar, formerly Superior Judge of that County, in an article in the April, 1938, State Bar Journal of California, is somewhat critical of juvenile courts and says: "Active young criminals invariably ask that their cases be sent to the Juvenile Court." Furthermore, if the accused waives a jury the District

Court may transfer the case to the Juvenile Court. The argument of the majority last adverted to does not impress me favorably. It is beside the point. The rights of the individual guaranteed by the constitution cannot be determined by the criterion of whether we think them useful or otherwise.

After a prolonged study of the act, I am influenced by the deep conviction that it was the legislative thought that no great stigma or ignominy will attach to a juvenile to be made a ward of the court for indulging in bad habits or associations, or even commission of petty offenses, but that it is quite another matter to have of record in the juvenile court a judgment that an accused juvenile has been adjudicated to have committed rape, robbery, assault with intent to kill, or any other infamous or felonious offense with the stigma and ignominy attached thereto without having had his constitutional right to a trial by jury.

When we were unanimously in support of this view, as expressed in the opinion originally filed, I was able to concur in the conclusions that the petitioner had not otherwise made a good case against the constitutionality of the statute, but with the majority change of position on this important element of the case, resulting in the further detention of the petitioner instead of his discharge, I am cast in doubt as to whether some of his other positions may not have been well taken.

Since the objections to the opinion and decision of the majority, which I have here specifically developed are insurmountable, I find it unnecessary to elaborate those doubts. I dissent.